Filed 4/4/14  In re Sebastian M. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re SEBASTIAN M., a Person Coming Under the Juvenile Court Law. | B246025 (c/w B247863) (Los Angeles County Super. Ct. No. CK91302) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. CHRISTOPHER M., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Rudolph A. Diaz, Judge.  Affirmed as modified and remanded with directions.

Lisa A. Raneri, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Jacklyn K. Louie, Deputy County Counsel, for Plaintiff and Respondent.

_____

This is the second appeal from Christopher M. (father).  This time, he appeals from a juvenile court order granting a petition for modification (Welf. & Inst. Code, § 388)[1] that resulted in the suspension of his visits with his then four-year-old son, Sebastian M. (Sebastian, born Dec. 2007), until he participated in court-ordered services and no longer posed an emotional threat to the child.  In a later proceeding, the juvenile court also granted a five-year permanent restraining order protecting Sebastian and his mother, E.J. (mother).

We affirm the juvenile court's order granting DCFS's petition for modification.  Ample evidence supports the juvenile court's determination that it is detrimental to Sebastian to continue visitation with father when father steadfastly refuses to comply with the court-ordered case plan.  Thus, there was no abuse of discretion.

Father forfeited his challenge to the restraining order's protection of Sebastian.  Even if he had not forfeited this argument on appeal, we would still affirm the issuance of a restraining order; substantial evidence supports the juvenile court's order.  That said, the juvenile court erred in issuing a five-year restraining order.  Thus, the matter is remanded to the juvenile court to modify the restraining order to expire three years from the date of issuance (Feb. 1, 2016).

FACTUAL AND PROCEDURAL BACKGROUND

*Section 300 Petition and Detention*

This family came to the attention of the Department of Children and Family Services (DCFS) on November 25, 2011, when DCFS received a referral alleging that mother and her boyfriend, Luis Ruben L. (Ruben), engaged in domestic violence and that Ruben had slapped Sebastian with an open hand.  (*In re Sebastian M.* (Feb. 20, 2013, B240157) [nonpub. opn.] (*Sebastian I*), p. 2.)

Emergency response worker Raquel Valenzuela (Valenzuela) interviewed Sebastian, who denied witnessing domestic violence between mother and Ruben.

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

Sebastian also said that Ruben never hit him; father told him to say that Ruben did.  Also, father once told Sebastian to stab Ruben.  (*Sebastian I*, *supra*, B240157, p. 2.)

"Mother denied the allegations, stating that father had made false reports to DCFS in the past. . . .  She also asserted that father had been stalking her and insulting her in front of Sebastian since their relationship ended in 2010.  Father had been arrested on April 23, 2011, for threatening to kill mother and Ruben and for hitting Ruben with a cane.

"Previously custody orders issued in family court in May 2011.  The family court had denied mother's request for a restraining order against father, but ordered the parents to exchange custody of Sebastian in the lobby of a police station and to conduct all nonemergency communication through the 'Our Family Wizard' Web site.  Subsequently, a criminal protective order issued under Penal Code section 136.2.

"Mother claimed that during the custody exchanges, police officers observed father insulting her in front of Sebastian.  The officers warned and counseled father and, on one occasion, asked him to leave first.  Mother also claimed that father followed a social worker home and insulted her.

"Father stated that DCFS was not protecting his child, who was being exposed to domestic violence and being hit by Ruben.  Reportedly, when the social worker explained that there was no evidence of physical or emotional abuse to the child, father insulted the social worker, stating that she was biased in favor of mother because they are both Hispanic.

"Valenzuela interviewed Sebastian in his room with father's permission.  When asked about Ruben, Sebastian became very quiet and checked the door to make sure that it was locked.  He also put his head in a pillow and did not want to talk.  Sebastian denied being hit by father or Ruben.  He told father that Ruben tickles him, but father told him to say that Ruben hits him.  Sebastian stated that father asks him a lot of questions about mother and Ruben, and "'he says that I have to tell him everything or else he will get mad at me.'"  When asked what happens if he does not tell his father, Sebastian responded, "'but I do and then he is happy.'"  Later, Sebastian became quiet and sad and began to

3

cry, saying "'I'm not going to see my puppy, I want to go to my mom's house to see my puppy.'"" (*Sebastian I*, *supra*, B240157, pp. 2–3.)

"Sebastian's family law attorney opined that father was using the family law court and Sebastian to "'get to mother'" and suspected that father was probably coaching Sebastian." (*Sebastian I*, *supra*, B240157, p. 4.)

On December 13, 2011, "Sebastian told the social worker that he and father passed by mother's address and began to follow Ruben by car. According to Sebastian, father also looks at mother's Facebook page, and points to her and calls her a bitch. Sebastian indicated that he was not afraid of father.

"Officer Martinez said that father had behavioral issues during custody exchanges at the Sheriff's station, including continuing to try to speak to mother after she refused to speak to him. On one occasion, mother was advised to leave the station first and father was counseled to speak to mother through the 'Family Wizard.' On another occasion, father was physically removed from the police station.

"Mother reported that during a recent custody exchange, father insulted her outside of the police station, stated that he knew her address, and yelled the address to her in front of Sebastian. Sebastian said that father went to mother's address and told him to point out mother's apartment.

"Mother also claimed that father recently waited for her outside the police station in his car after they completed a custody exchange. Officers also witnessed father at the police station waiting for mother to leave. Detective White stated that father seemed agitated and demanding, and stated that mother needed to speak to him in person. Detective White advised him to communicate with her through the 'Family Wizard.'

"Detective White also informed the social worker that a criminal hearing was set for January 23, 2012, regarding the April 23, 2011, charges against father for assault with a deadly weapon and criminal threats to mother and Ruben. The police also had been called to mother's old address several times because father allegedly violated orders, wrote lewd letters to mother, and threatened Ruben. The police counseled father and released him." (*Sebastian I*, *supra*, B240157, pp. 4–5.)

4

On January 4, 2012, DCFS filed a section 300 petition on behalf of Sebastian. At the detention hearing, the juvenile court detained Sebastian from father and released him to mother. Father was allowed monitored visits three times a week, two hours per visit. (*Sebastian I*, *supra*, B240157, p. 5.)

*Restraining Orders*

Valenzuela and supervising social worker Raquel Rivas filed applications for restraining orders protecting them from father. On January 24, 2012, the juvenile court issued mutual stay away orders for father and the social workers. (*Sebastian I*, *supra*, B240157, p. 5.)

*Jurisdiction/Disposition Report; Last Minute Information and Hearing (Feb. 1, 2012)*

DCFS initially recommended that the juvenile court dismiss the section 300 petition without prejudice, concluding that, while father appeared to be harassing mother, there was no clear indication that he purposefully intended to cause Sebastian any detriment. But, on February 1, 2012, while waiting in the courthouse lobby for the case to be called, mother told social worker Jose Sartorio (Sartorio) that father had threatened her. Father denied threatening mother and complained that DCFS was permitting his child to live with a woman with a sixth grade education. (*Sebastian I*, *supra*, B240157, pp. 5–7.)

DCFS changed its recommendation because "father had 'an anger management issue and a clear lack of control' that seemed likely to expose the child 'to emotionally harmful confrontations between his parents instigated by the father.' Although Sebastian did not disclose to Cardenas that his father instructed him to stab Ruben in the chest, Valenzuela reported that the child was very serious and credible when he made these statements in the detention report." (*Sebastian I*, *supra*, B240157, p. 7.)

*"First Amended Petition*

"On February 9, 2012, DCFS filed a first amended petition on behalf of Sebastian pursuant to section 300, subdivisions (a) and (b). The amended petition contained the same allegations as those in the original petition and added count b-3, alleging that father 'demonstrated behavior consistent with emotional problems,' by 'engaging in

5

uncontrollable, extremely aggressive and volatile behaviors towards others.'" (*Sebastian I*, *supra*, B240157, p. 8.)

*"Interim Review Report*

"On February 16, 2012, DCFS reported that, during a new interview, Sebastian indicated that father calls mother a bitch all the time. During the previous interview, Sebastian stated that father only called mother a bitch once or twice. Sebastian also disclosed that Ruben had punched him in the chest while they were doing a somersault and playing. When asked who told him to say that, Sebastian appeared puzzled. No bruises were observed on Sebastian's chest. Sebastian responded affirmatively when asked if someone told him to stab Ruben with a fork, but he did not identify the individual.

"Father denied mother's allegations that he called her derogatory names and threatened her in the courthouse on February 1, 2012. He also denied instructing Sebastian to point out mother's apartment, telling Sebastian to stab Ruben with a fork, telling Sebastian to say that Ruben had hit him, and insulting mother at the police station. He believed that mother was coaching Sebastian because he heard his son say that someone told him to say that father touches him all over his body. Mother claimed that father had recently called her, but father explained that he accidentally dialed mother's telephone number.

"Father presented Cardenas with the family court docket, which indicated that the family court had denied mother a restraining order because she failed to prove her allegations against him. That said, father had not obeyed the family court order that he not go to mother's residence when he went to her home on April 23, 2011. Mother presented Cardenas with the criminal protective order filed on June 21, 2011.

"Valenzuela stated that she felt threatened and scared of father because he 'would constantly call her pressuring her and on several occasions called her ignorant and accused her of not doing her job.' When 'she would try to deescalate him . . . he would laugh at her.' He waited for her and her supervisor in the lobby for six hours and videotaped them leaving the building. He also told her that he could '[G]oogle' her and

6

find her. Valenzuela also claimed that when she interviewed Sebastian at father's home, Sebastian appeared 'very aware that his father may be listening' and 'appeared nervous and got up to check if the door was closed.'" (*Sebastian I*, *supra*, B240157, pp. 8–9.)

Mother's acquaintance, Lidia C. (Lidia), who is a social worker, helped mother prepare paperwork for her family law case and served father a notice of hearing. Lidia claimed that father had called her and insulted her, and also went to her home and told her husband that he wanted Lidia to stay out of his family's problems. (*Sebastian I*, *supra*, B240157, p. 9.)

"A deputy city attorney stated that his office was not dismissing the criminal case (charging criminal threats, spousal battery, petty theft, simple battery, and trespassing) against father." (*Sebastian I*, *supra*, B240157, p. 9.)

"*Last Minute Information*

"In a subsequent report, father reportedly asked Sebastian questions about mother and Ruben during a recent monitored visit. Sebastian appeared anxious and stated several times that he wanted to go with mother. Sebastian also indicated that he wanted his father to come to the visits after being asked several times. Father expressed dissatisfaction with having to go to DCFS to visit his child. He also expressed that Ruben continued hitting Sebastian, but DCFS failed to do anything about it. At the end of the visit, when Sebastian said that he was thirsty, father reportedly told Sebastian that his mother would give him something to drink because she had money and was "'a better parent.'"

"After the visit, social worker Sartorio received an e-mail from the Child Protection Hotline, stating that father reported that the social worker had told him to contact the hotline to report his concerns. The social worker claimed that he did not tell father to call the Child Protection Hotline." (*Sebastian I*, *supra*, B240157, p. 10.)

*Combined Jurisdiction/Disposition Hearing*

<u>Father's Testimony</u>

At the March 12, 2012, combined jurisdiction/disposition hearing, father denied acting inappropriately at custody exchanges at the police station. He believed that mother

7

and Lidia coached Sebastian to say that father says bad words to mother. He also denied talking about mother during his last visit with Sebastian. And, father denied all of the allegations and damaging statements made against him, although he indicated that he may have struck Ruben in the face with his fists. He also questioned the reason Hispanic social workers were assigned to the case, given mother speaks fluent English and he does not speak Spanish. He denied stating that Hispanic people were ignorant. (*Sebastian I*, *supra*, B240157, pp. 10–11.)

"Father stated that the district attorney's office had rejected a criminal case against him. The city attorney's office decided to prosecute the case after mother sought a restraining order against him. All of mother's requests for restraining orders against him had been denied. He and mother had a 'keep the peace' order in place, not a criminal restraining order.

"Finally, father testified regarding a recent incident at an El Pollo Loco. He said that he went to buy lunch for Sebastian to take to their visit as he always does. He saw Sebastian and mother there. He said 'hi' to Sebastian and walked out. He took a picture of mother to establish that she had failed to attend therapy as ordered. He did not threaten mother." (*Sebastian I*, *supra*, B240157, p. 11.)

Mother's Testimony

Mother testified that Sebastian had not been diagnosed with anxiety or depression, but sometimes he had difficulty going to sleep after visiting father.

"Mother asserted that father had called her derogatory names in front of Sebastian, including at the police station. A week ago, Sebastian called her a bitch, stating that is what his father calls her. Over father's objection, mother testified that Sebastian stated that father told him to stab Ruben with a fork while Ruben was sleeping. Sebastian also stated that father told him to say that Ruben hit him, but Ruben never hit Sebastian.

"Mother then testified that she unsuccessfully attempted to obtain a restraining order in family court; however, in June 2011, she obtained a criminal restraining order against father, which expires in three years. She felt threatened by father because she did not know if he would be there when she went out or what he is capable of doing. In

8

March 2011, father entered her home when she opened the door for Ruben, grabbed her neck, and pushed her against Ruben and took her cell phone.  Father had also followed her while he had Sebastian in the car and called her derogatory names and made a negative comment.  She could hear Sebastian crying.  Father also called her a week ago and began yelling at her, even though the court had ordered him not to contact or approach her.

"Mother then told the juvenile court about the recent incident at El Pollo Loco.  Father arrived there while mother and Sebastian were eating lunch.  Father did not threaten them, but started taking pictures of them and was laughing.  Sebastian responded by trying to explain the situation to himself, stating:  'Why is my dad doing this?' and 'Oh, maybe it's because he loves me.'" (*Sebastian I*, *supra*, B240157, p. 12.)

Valenzuela's Testimony

"Valenzuela testified that Sebastian cried and was emotional and guarded during her interview of him.  However, she had interviewed other children who cried and were sad.  When she asked Sebastian why he was crying, he replied:  'I'm not going to see my puppy any more.'  Sebastian also checked the door to make sure it was closed while he was disclosing information about father. . . .

"She further opined that father was manipulative and demanding, and she was afraid of him because she felt she 'needed to listen to him' when he told her to re-interview Sebastian.  She was offended that he said that she was biased in mother's favor based upon her ethnicity.  Father admitted that he repeatedly called her from an unknown number; he also breathed heavy into the phone.  One time, he went to the DCFS office at 1:30 p.m. and was there at 5:30 p.m. when she left.  The next day, he claimed to have videotaped her leaving the building.  He also made a statement about finding out where she lived.

"Cardenas's Testimony

"Cardenas testified that he had worked for DCFS for three years, but only had worked as a dependency investigator for five months when he was assigned to this case.  He made a mistake when he recommended dismissal of this case because he failed to

9

give enough weight to Sebastian's initial statements to the emergency response worker. He reexamined everything when he learned of the event outside the courtroom.

"He stated that father had behaved aggressively outside the courtroom on February 1, 2012, by calling mother a bitch. He admitted that he had not witnessed the incident and had never observed the parents interacting. He also believed that domestic violence was an issue because father insulted mother as he drove by with Sebastian in the car crying, and because he threatened mother at a party in Sebastian's absence." (*Sebastian I*, *supra*, B240157, pp. 12–13.)

"Cardenas believed that father was not concerned about Sebastian because father questioned Sebastian about mother and Ruben during a recent visit.

"Cardenas opined that father was dangerous because he could not control himself in the courtroom, the DCFS office, or a police station. He had also acted aggressively toward and insulted and threatened mother and her friends, including by going to Lidia's home, approaching her husband, and asking them to stay out of his business. Cardenas believed that father posed a threat to anyone trying to help mother. In fact, the first two social workers on the case were scared of father because he waited at the office for five hours and videotaped them.

"Juvenile Court's Order

"After entertaining oral argument, the juvenile court sustained counts b-1,[2] b-2,[3] and b-3[4] of the first amended petition.

---

[2]    Count b-1 alleges that mother and father "have a history of engaging in violent altercations. On a prior occasion, . . . father bit . . . mother's shoulder. On 4/23/2011, . . . father threatened to kill . . . mother. On a prior occasion in 2011, . . . father stalked . . . mother while the child was a passenger in the car and called . . . mother derogatory names in the presence of the child. On numerous prior occasions, . . . father stalked . . . mother. Such violent conduct on the part of . . . father against . . . mother[] endangers the child's physical health and safety, creates a detrimental home environment and places the child at risk of physical harm, damage and danger."

[3]    Count b-2 alleges that on April 23, 2011, mother's male companion and father "engaged in a violent altercation, in which . . . father repeatedly struck the male

10

"Dispositional Phase

"During the dispositional phase of the proceedings, Cardenas testified regarding the recommended case plan, which included a 52-week domestic violence program, a 52-week parenting program, drug testing, individual counseling, and an anger management program. Cardenas also was not opposed to father undergoing an Evidence Code section 730 evaluation to determine what drives his behavior." (*Sebastian I*, *supra*, B240157, p. 15.) Father objected. (*Id.* at p. 15.)

"The juvenile court . . . declared Sebastian a juvenile court dependent, removed him from father, and placed him with mother with family maintenance services. Father was ordered to participate in family reunification services, including a 52-week domestic violence program, a 52-week, probation-approved parenting program, anger management counseling, and individual counseling with a licensed therapist. He was also required to

---

companion's body with a wooden cane and struck the male companion's face with [his] fists. On 4/23/2011 and on a prior occasion, . . . father threatened to kill the male companion. Such violent conduct on the part of . . . father against the male companion, endangers the child's physical health and safety, creates a detrimental home environment and places the child at risk of physical harm, damage and danger."

[4] Count b-3 alleges that father "demonstrated behavior consistent with emotional problems as demonstrated on 03/01/2011, 04/23/2011, 02/01/2012 and on numerous prior occasions, by father engaging in uncontrollable, extremely aggressive and volatile behavior towards others. On 03/01/2011 . . . father physically assaulted . . . mother and her boyfriend. On 04/23/2011, . . . father assaulted . . . mother's boyfriend and threatened to harm . . . mother, [her] boyfriend and . . . mother's guests. On 02/01/2012, . . . father verbally assaulted . . . mother by calling her a 'bitch' in the waiting lobby of Children's Court despite the services Children Social Worker's attempts to redirect . . . father to stay away from . . . mother. On prior occasions . . . father has not been able to control his behavior while exchanging his child at the police station and has been asked to leave the police station and advised not to speak to . . . mother while conducting the exchange. On a prior occasion . . . father has pointed out . . . mother to the child and identified her as a bitch. On prior occasions . . . father has instructed the child to point out mother's apartment. On prior occasions . . . father has directed the child to stab . . . mother's boyfriend with a fork while [he] is sleeping, and to falsely accuse . . . mother's boyfriend of hitting him [the child]. Father's behavior places the child at substantial risk of physical and emotional harm and damage."

11

complete eight consecutive random drug tests and to submit to a psychiatric evaluation. Finally, father was granted monitored visitation." (*Sebastian I*, *supra*, B240157, p. 15.)

*Appeal*

Father's timely appeal ensued. (*Sebastian I*, *supra*, B240157, p. 16.) On February 20, 2013, we affirmed the juvenile court's dispositional order, directing father to participate in a 52-week parenting program and eight consecutive, random drug tests. (*Sebastian I*, *supra*, B240157, p. 2.)

*Interim Review Report*

DCFS submitted a June 12, 2012, progress report. Sebastian remained with mother. He was participating in individual counseling.

DCFS reported that father had been arrested on April 23, 2011, and charged with felony assault with a deadly weapon and making criminal threats against mother and her boyfriend. The investigation was pending.

Father was not compliant with the court-ordered case plan. He asserted that he was not "'crazy'" and would not be participating in an Evidence Code section 730 psychological evaluation. He stated that he did not need to attend parenting classes as he believed that he was a good parent and had educated his child since he was a baby. He did intend to continue visiting his son until Sebastian was older and understood on his own the situation.

Father also refused to attend the domestic violence classes because "'That is crazy.'" He indicated that he would be appealing those orders.

Father told the social worker: "'Get the referrals back to your supervisor and tell her to shove them up to her a\*\*.'" He refused to sign the receipt for the referrals. However, he did agree to test for drugs and alcohol.

But, by April 5, 2012, father refused to test[5] and continued to refuse receiving referrals from the social worker. He told her not to waste county money or paper or his time. He nudged her to put in his court report that he "'refuse[d] to cooperate.'"

---

[5] Father was a "no show" for drug tests on April 17, May 1, and May 17, 2012.

12

A few days later, father said that if Sebastian were ordered to be with mother, he would "'go[] on a rampage'" and that there would be "'some victims.'" He then threatened the social worker, saying "'Someone is going to jump on you [CSW Sartorio] from nowhere.'" Father referred to the social worker as his "'enemy,'" accused the social worker of being "'guilty'" for taking his son, and stated that he did not care if he had to go to jail or die.

Meanwhile, the social worker continued to attempt to facilitate the Evidence Code section 730 evaluation for father and to remind father of his court-ordered services. Father replied that he would not be complying and questioned why the juvenile court did not order mother to drug test.

Mother was on a waitlist for individual counseling and had an in-home family preservation services counselor assigned to her.

The social worker observed that father was capable of being loving with Sebastian during visits. They could interact positively and were observed to like each other's company.

But, father had also threatened the social worker and made inappropriate statements in Sebastian's presence. The child seemed uncomfortable when father did this. Father also questioned Sebastian persistently about mother and their home life, even though Sebastian did not want to answer. As a result of father's threats, Sartorio filed a police report and a security incident report with the Los Angeles County Office of Security Management.

Father claimed that mother was exposing Sebastian to fear-based religious ideas, such as "'the rapture'" and "'fire and brimstone,'" which Sebastian apparently told father scared him. Mother said that father had called the health department, alleging that she had roaches and rats in her apartment. When the health department went to her home, they commended her on her clean apartment. She said that she had caught one mouse in a trap and disposed of it.

Mother told the social worker that she had taken Sebastian to the doctor a second time because of an ear ache. The doctor prescribed ear drops. Mother said that she was

13

scared of father. He followed her around and videotaped her and Sebastian. She denied that her companion or Sebastian's adult half-sibling hit the child or that her home was overrun with roaches and rats, as father had alleged.

The social worker observed a bond between mother and Sebastian. Twice while visiting with father, Sebastian said that he wanted to return to mother.

Attached to the report was a March 29, 2012, progress letter from Sebastian's therapist, Joy R. Malik. Sebastian had begun individual therapy with the treatment goal of decreasing his anxiety. Mother had been cooperative and Sebastian had been attending sessions consistently. The therapist noted that given the level of anxiety Sebastian suffered, "it [was] important that [his] environment be highly structured, safe, consistent, and predictable."

*Delivered Service Log*

As part of the appellate record, we were provided a redacted delivered service log from April 1, 2012, through August 20, 2012.

During monitored visits, father would bring food and a toy car for Sebastian and normally greet the child with a hug and a kiss. Father would allow Sebastian to listen to music on his cell phone. He would make the child practice writing letters. Father would groom the child's hair, even if Sebastian protested. Sebastian was relaxed and seemed to enjoy the visits. But, father continually asked Sebastian questions, such as what was happening while he was with mother, where the missing toy cars were, how Sebastian got small scratches or marks or colds or stomach aches that he may have had. Father also would take pictures of the child's body parts that had marks.[6] The constant questioning would agitate Sebastian and make him nervous. Father would also ask Sebastian whether his name was "Sebastian M." (father's last name) or "Sebastian J." (mother's last name). Mother reported that father had instructed the child not to let "'the fagot'" (referring to

---

[6] Some of the marks were so small that they were difficult to see with the naked eye or would go unnoticed unless pointed out.

14

Sartorio) hold his hand when walking the child from where mother had dropped him off to the visitation site in the DCFS building.

April 5, 2012, Visit

Father told Sebastian that he would bring him a baseball bat and ball to break some of the windows at DCFS.

April 10, 2012, Visit

Sebastian told father that he had not gone to the doctor for his ear and had forgotten that he was not supposed to tell him. Sebastian also told father that 15-year-old Janice was going to keep him but had changed her mind. Father did not think Sebastian was telling the truth. He went to the receptionist and asked for Sartorio and the supervising social worker so that he could complain about mother's failure to take Sebastian to the doctor and the 15-year-old babysitting Sebastian. Father went on to say that mother was tricking DCFS into making the social workers think that he was a bad person. Sebastian told father that he was not a bad person.

When the supervising social worker entered the room, Sebastian panicked because he believed that she was going to take him away. The visitation monitor, Edith Tyrone (Tyrone), assured Sebastian that the supervising social worker was not there to take him away; she was going to talk to father. Then, Tyrone distracted Sebastian by taking him out of the room and playing with him.

When the visit ended and Tyrone took Sebastian to mother, she asked mother about Sebastian's ear. Mother said that she had made a doctor's appointment for that afternoon and agreed to call afterwards. That evening, mother called Tyrone to report that the doctor said that Sebastian had an ear infection and prescribed an antibiotic.

April 12, 2012, Visit

Father, while smiling, told Sebastian (and indirectly told Sartorio) that he had appealed the juvenile court's decision and that in three weeks, he would "'sue these people and . . . buy a brand new Ferrari.'" Father said that he wanted a "'Black'" social worker. Father accused DCFS of being racist, noting that the juvenile court judge was

Hispanic and that his request for a Black social worker had not been fulfilled. Father believed that "everything 'was a set up' against" him.

Father then said "'December 21st.'" When Sartorio asked father what he meant, father responded that, according to the Mayan calendar, it was the end of the world and that various county agencies would be "'the first to go.'" Father questioned why he, who was not a harm to Sebastian, could not have his child when instead the child resided with mother in a home with rats. When Sartorio explained that it was the juvenile court that had decided that father's visits should be monitored, father asked who made the recommendation.

At the end of the visit, father said that he would go to the other side of the building to say hi to mother.

### April 19, 2012, Visit

Father told Sartorio, "'You don't know how much I hate you guys.'" He then said that he and his friend were laughing at a recorded conversation with Sartorio. The social worker told father that he had not given his permission to record him. Father replied that he recorded everyone at DCFS and stated that he did not give DCFS consent to videotape him using the cameras in the DCFS building.

When Sartorio reminded father of the case plan, father responded that the social worker should not waste his time and that he would not be following through.

After the visit ended, father went to the other side of the building, stood about 20 feet from mother and said, "'Bye Linda (mother), bye Sebastian, bye Jose (the social worker).'"

### May 24, 2012, Visit

Social worker Susan Pender (Pender) monitored this visit. Father took Sebastian to the water fountain for a drink. Then, suddenly, father took the child into the restroom and closed the door. After waiting for them to come out, Pender knocked on the door and asked if everything was okay. There was no response. Pender then told father that, from now on, if Sebastian needed to use the restroom, then either she or a male social worker would accompany him. Pender instructed father to bring the child out as soon as

16

possible. Pender then heard father and Sebastian loudly singing, almost tauntingly. When father and Sebastian finally emerged, father was angry and laughed at Pender, saying that she did not know what she was doing. "'[N]o other staff has ever prevented me from going to the restroom with my son.'" Pender asked father to calm down, reminding him not to get agitated in front of his son and that this was a monitored visit. If father had an issue with it, then he could discuss it with the assigned social worker.

May 31, 2012, Visit

Mother arrived early at the designated drop-off spot. But, she saw father watching her car. Because she did not see the social worker and felt unsafe, she moved the car away, only returning when she saw Pender coming her way. When Pender was walking Sebastian from mother's car towards the DCFS building, she saw father immediately behind the building.

At the start of the visit, Pender reminded father about the monitored visit, including not taking him to the restroom and closing the door. Father became angry. She reminded him to calm down, which he did.

During the visit, Pender realized that she had left her cell phone outside the lobby. She began to go to fetch it, along with Sebastian, when father laughed, telling Sebastian, "'[Y]ou don't have to go anywhere with that lady.'" Sebastian looked confused and torn as to what to do. Pender responded that it was not appropriate to teach Sebastian to disrespect her. Father retorted, "'[Y]ou took him away from me and you want me to encourage him to respect you?'"

June 1, 2012, Visit

Visitation monitor Sharrae Williams (Williams) met mother and Sebastian at the designated spot. From inside the car, Sebastian was pointing behind Williams. Sebastian and mother looked nervous. When Williams turned to look, she saw father approaching, then going to the food truck, smiling, and then walking away. Williams and Sebastian went to the lobby, where father was waiting.

17

*June 6, 2012, Hearing*

The juvenile court admonished father to cooperate with DCFS. His request, made through counsel, for the juvenile court to order that a new social worker be assigned to the case was denied, with the juvenile court observing that it was DCFS's decision and that it did not believe that father would "get along with anybody."

*Delivered Service Log*

June 7, 2012, Visit

Father brought a "'motorized Nerf dart gun set'" to play with on the visit. The label indicated that the appropriate age for the toy was six years and up; Sebastian was only four years old at the time. Father used terminology associated with real guns and ammunition, such as assisting Sebastian with "loading" the Nerf gun and darts and telling the child, "'you've got to turn the barrel as you're loading,'" "'don't point the gun towards you while you're loading or you'll shoot yourself,'" and "'alwa[]ys make sure that the safety is on.'" Father stopped the "'gun battle'" so that Sebastian could eat. Sebastian did not like that father was shooting the darts directly at him and told father to shoot at the target instead of him. Father replied that there are "'no rules in war.'"

When Sebastian sat in a chair that wobbled, father fixed it, but then said that Sebastian should have just fallen off onto the floor. When Sebastian asked why, father answered: "'[B]ecause if you hurt yourself, then we could sue the county and get a lot of money.'"

June 14, 2012, Visit

Sebastian seemed nervous at this visit and spoke quietly with Pender while the two walked through the building. Sebastian stopped and said that he wanted to tell her that he was sick; he had a cold. When they met father in the lobby, father immediately asked if Sebastian felt the earthquake the night before. Father said that he wished it had been bigger so that it would have knocked down the DCFS building.

Sebastian told father that he was sick. Father started questioning him in an accusatory fashion: "'How'd you get sick? They're not taking care of you there?'" "'[W]here have you been sleeping?'" Father also asked if Sebastian had been to the

18

doctor and if not, why not. Sebastian stated that he had a cold. He then ignored father's questions, but father persisted.

Father then became insistent that Sebastian bring all of his toy cars to the visits. Father's tone was angry. He suggested that if "'these people'" could not get that message to mother, then maybe Sebastian should. The case notes read: Sebastian "was appearing very stressed at this point and CSW confronted father and told him that he needed to stop saying negative things about child's mother, the case issues and also to back off with all the questioning of the child. CSW told father that this was stressing the child and that he should instead focus on having fun with his visit with his child. Father responded by stating that it was 'you guys' that are 'causing all the problems.'" Father then calmed down a little and returned to Sebastian.

Later, father said to Sebastian in a negative tone, "'[T]hat's right it's because you're sick'" and only "'[k]ids that are neglected get sick. Why are you sick?'" Sebastian tried to tell father that "'kids get sick,'" but father repeated that the only children who get sick are the neglected ones. Sebastian became even more stressed. Pender tried to redirect father, but father pointed at Pender and said to Sebastian, "'[T]hey're never gonna let you come home with me. They're working together with your mother.'" Sebastian became increasingly stressed and asked to call mother to get him. Father told him to go ahead, but then said, in a sarcastic tone, that he would have to use one of DCFS's telephones. Sebastian eventually finished the visit, listening to music on father's telephone. While Sebastian was occupied with the music, father said, "'I see what's going on here, there's a lot of racial profiling going on here with you guys. It's only the bi-racial children.'"

<u>June 19, 2012, Visit</u>

Sebastian told the social worker that his stomach hurt and that he wanted to go home. Father yelled at the monitor: "You need to get a supervisor down here, so she can question him because they are telling him to say his stomach hurts." While waiting for mother to return, father began questioning Sebastian about whose house he went to, which social worker's house did he visit, why he wanted to leave, and who told him to

19

say that he wanted to leave. When father asked, "Are those f***ing people telling you to say this," Sebastian walked away; father grabbed him by the wrist, insisting that Sebastian identify the people who told him to say that he had a stomach ache so that he could leave. The monitor, unaware of why father had grabbed Sebastian, took the child by the hand. Father continued to question Sebastian and told him that he needed to tell the supervisor who was instructing him to say that he had a stomach ache; he also need to report which social worker's home he had visited over the weekend. Sebastian became anxious, looked worried, and put his head down between father's legs. Father only became louder: "[T]hese people who are ruining everybody['s] lives, they pretend to help while they are working against you, they are all full of shit. They better get a Supervisor down here to hear what you have to say." Father continued to yell out negative comments about DCFS and use profanity. When father started questioning the child again, Tyrone told him to stop constantly questioning Sebastian; his job was to visit with his son. Father again asked Sebastian why he wanted to leave the visit. Sebastian replied that his stomach hurt and he simply wanted to leave.

When mother came to pick up Sebastian, she spoke with the monitors about the visit. Mother shared that Sebastian said that he no longer wanted to come to the visits. He wanted to see father, but he was tired of the many questions.

The other monitor, Williams, noted that father told Sebastian that if he left the visit, father would never visit him again. Sebastian asked, "[N]ever?" Father replied, "[N]ever."

Sartorio later spoke with Sebastian, who said that he did not like father questioning him about mother. Sebastian said that it made him cry when father said that he did not want to see him again: "'I cry for one day.'" Sebastian reported that father did not want to see him because Sebastian had a stomach ache and wanted to return home early. He explained that his stomach hurt because he had a bad dream that he would never see his parents again. He wanted to live with both of his parents.

Sebastian then told Sartorio: "'My dad told me when to lie. Friday, see my dad told me, I made a lie.' . . . 'My dad lies a lot. My dad told me I lie. I don't want to lie.'"

Finally, Sebastian stated that he was happy to see father.

Mother relayed Sebastian's statement that he no longer wanted to visit father, who had told his son that he would not see him again. Mother also reported that father gave Sebastian a toy gun and told him to shoot a 21-month-old niece in her face because she had scratched Sebastian in the face.

### June 22, 2012, Visit

Although a monitored visit on June 21, 2012, occurred without incident, on June 22, 2012, father returned to his harassing questions of Sebastian. Sebastian told father, "Dad no questions today." Father then wanted to know who told him not to answer his questions. Sebastian answered that it was Tyrone; father looked at Tyrone without saying a word.

At the end of the visit, it appeared that father was walking towards a man to confirm that he was not with mother. Sebastian yelled that father was coming. Mother looked frightened and rushed into the car, with Sebastian, and drove away.

### June 25, 2012, Investigative Referral

The in-home counselor, Lupe Luna, relayed that father's stream of allegations was making mother increasingly paranoid. She was putting oatmeal on every scratch Sebastian got while playing. She told Sebastian's older sister not to let the 21-month-old niece play with Sebastian because she did not want him to get scratched again and have father make allegations against her.

Ms. Luna also reported that Sebastian would manipulate mother. But, mother was open to parenting classes to help her be more firm with him. Ms. Luna also indicated that she would speak with Sebastian's therapist to address his behavior with mother.

### June 28, 2012, Visit

Father reproached Sebastian for speaking Spanish during the visit; father seemed irritated and disgusted by Sebastian speaking Spanish.

### July 5, 2012, Visit

Father again questioned Sebastian as to who told him to say he had a stomach ache, even though this time it was because father had insisted that Sebastian continue

21

eating after he indicated that he was full. Father said, "'You're just saying that to make the social worker[]s happy. This place is really messed up.'" Father's comment upset Sebastian. He listened to music on father's headphones and was able to calm down. Father sat next to him. A while later, father asked Sebastian whether his last name was "M." or "J."

### July 6, 2012, Visit

During this visit, father gave Sebastian a hard time about reading numbers on a vending machine, having Sebastian hold a large bottle of water that was difficult for a small child to manage, wanting to know when Sebastian last bathed, and whether he got to play outside with other children when he was with mother. The social worker would intervene, pointing out father's unrealistic expectations of a four-year-old boy and the inappropriateness of his remarks.

### July 12, 2012, Visit

At the start of the visit, Sebastian spontaneously pointed to marks that were hardly visible on his arm and said that he did them to himself, "'no one did them to me.'" But father did not acknowledge his statements. Later, when Sebastian yawned, father began to pepper him with questions about his sleep. Father became frustrated, telling Sebastian not to ignore him. Sebastian ate the food that father brought and they played together for the remainder of the visit.

### July 19, 2012, Visit

This visit occurred in the DCFS lobby. Father threatened to call the police because he "'felt uncomfortable with the environment.'" He preferred a room with a camera in it. Father then told Sartorio that "'We have a criminal case pending.'"

They moved to a meeting room where the social worker left the door open so that security had a clear view inside. Father told Sartorio that DCFS lied in the reports and that he (Sartorio) had lied when he reported that father had called mother a "bitch" while they were in the lobby outside the courtroom. He accused Sartorio of setting father up that day. Father then proceeded to tell Sartorio that he was making him mad. Next, in Sebastian's presence, father called mother a table dancer. Sartorio warned father that if

22

he continued to make inappropriate remarks in front of Sebastian, the visit would be suspended. Father accused "'you people'" of taking his son from him. He warned, "'The people in the bottom would be the first to go.'"

Father wanted to know what the social worker's recommendation was going to be, whether it would be to return Sebastian to mother. He added, "'I am not going to wait until the next court hearing date in September.'"

The supervising social worker then arrived and advised father that in the future, visits would take place in one of the rooms off the lobby or on the patio. At the end of the visit, Sartorio and Sebastian were walking to mother, who was waiting in a parked car. Sartorio noticed that father was walking along the same way and came within seven feet of mother's car before saying "'Byeee Linda.'"

*DCFS Section 388 Petition*

On July 27, 2012, DCFS filed a section 388 petition asking the juvenile court to suspend father's monitored visitation with Sebastian "until father follows through with a 730 evaluation, participates in counseling, resumes drug testing, enrolls and participates in all orders of the court and is assessed to no longer pose as [] an emotional threat to . . . Sebastian." The petition referenced an accompanying report, which highlighted father's violation of mother's restraining order while on DCFS premises, threatening mother and DCFS staff, intense questioning of Sebastian during visits, not responding to redirection when acting inappropriately during visits, being detrimental towards Sebastian during visits (as stated by Sebastian's therapist, Ashley Youngblood (Youngblood)), and father's refusal to participate in services and cooperate with DCFS.

A hearing was set for August 27, 2012.

*July 27, 2012, Interim Review Report*

This report relayed much of what was set forth in the delivered service log concerning father's July 2012 visits with Sebastian, as well as other statements and actions by father. As set forth below, "DCFS [had] grave concerns as to the status of father's mental health and the safety of the child . . . , mother . . . , and DCFS staff."

23

<u>July 19, 2012, Visit</u>

For example, at the July 19, 2012, visit, while mother waited for Sebastian and Sartorio, father verbally harassed her. Before, when mother arrived with Sebastian and was waiting for Sartorio to arrive, father approached mother, gesticulating and speaking to her in a confrontational manner. Pender witnessed the incident. Mother motioned to Pender to get Sebastian out of the car and tense situation.

Later at this same visit, father threatened Sartorio that he was "'on the bottom of the list'" and that they would be "'the first ones to go.'"

<u>Father's Call to DCFS Deputy Director</u>

It was further reported that father called the DCFS Metro North Deputy Director's office asking what it would take to have Sartorio changed as the social worker on his case. Father wanted to know if he would get a new social worker if Sartorio were to get hurt. When the Deputy Director asked if father was threatening to harm Sartorio, father denied that he was.

<u>July 20, 2012, Visit</u>

DCFS also reported about the July 20, 2012, visit between father and Sebastian. Tyrone was helping Sebastian out of mother's car, when mother yelled that father was behind Tyrone. Father began yelling at Sebastian about his bag. Sebastian was silent and seemed panicked. He looked back and forth from father to mother. Mother told Sebastian to go on the visit, while father continued to repeat, "'Get your bag'" to Sebastian. Father went ahead of Tyrone and Sebastian. He was frustrated and yelling about the bag.

When father arrived at the receptionist desk, he demanded that the regional administrator, the assistant regional administrator, and the supervising social worker go to the lobby. Father was yelling at Sebastian and yelling negative statements about DCFS to those in the lobby, all while on his cell phone, pacing and using profanity. Tyrone tried to take Sebastian away from the scene, but the child refused, saying that his father was calling the police. Sebastian was scared and anxious.

Tyrone told Sebastian that they would go upstairs to call mother and get something to eat. The assistant regional administrator and a supervising social worker passed by where Sebastian and Tyrone were waiting for mother. Tyrone advised them that she had terminated father's visit due to his outburst and disregard for the child. As Sebastian was returning to mother, he was heard saying, "'but dad is making trouble and is going to call the police.'" The assistant regional administrator and supervising social worker informed father that his visits would be suspended.

Information from Sebastian's Therapist

Sartorio spoke with Youngblood on July 23, 2012. She reported that Sebastian was anxious about what father would do and whether he would come to their home. Sebastian also worried when he got scratched, and he stopped wanting to play for fear that if he got scratched, father would call DCFS. Sebastian relayed his father's statement to him that the social workers would remove him from his home. Sebastian's anxiety was based on his not knowing how father would act towards him and his family. Sebastian told Youngblood that it made him sad when father got mad and would tell him that he would stop visiting him and would take away his toys.

Youngblood submitted a letter in which she reported that Sebastian demonstrated "significant anxiety surrounding his father" in his play during therapy, such as what would occur if father went to his home and what father would do. Sebastian was apprehensive because father caused "'too many problems'" and asked "'too many questions.'" Sebastian repeatedly expressed his fear that father would have him taken from mother.

After problematic monitored visits, Youngblood noticed "dramatic shifts in Sebastian's mood and behavior." He appeared "sad and withdrawn," as well as "confused about the way his father acts during these visits." Similarly, mother relayed that Sebastian usually had disrupted sleep after difficult visits with father.

Youngblood reported that Sebastian had been making substantial progress in therapy. His sleep and mood improved. Mother was consistent and active in treatment. The therapy goals were to work through past events and decrease Sebastian's anxiety.

<u>Criminal Court Restraining Order</u>

On July 24, 2012, mother gave the DCFS supervising social worker a copy of the June 21, 2012, criminal court restraining order. The social worker advised mother to carry it with her at all times and to contact the police each time father violated it.

<u>DCFS Recommendation</u>

Based upon DCFS's concerns about father's volatile and harassing behavior, DCFS recommended that the juvenile court suspend father's monitored visits until he participated in the court-ordered plan, submitted to the Evidence Code section 730 evaluation, and was assessed to no longer be emotionally detrimental to Sebastian.

*Father's Walk on Request*

On July 30, 2012, father filed a walk on request, stating that DCFS had terminated his visits "without a court order showing detriment." He asked that DCFS be instructed to follow court orders and allow him to visit his son.

*Delivered Service Log*

<u>July 31, 2012, Home Visit</u>

Sartorio visited mother's home on July 31, 2012. The in-home counselor was there as well. Sebastian was there and happy, occupied with painting and talking to Sartorio. Mother reported a change in Sebastian since visits with father were suspended. He was more relaxed and slept well.

*DCFS Request for a Restraining Order; Juvenile Court Grants DCFS's Request*

On August 2, 2012, DCFS filed a request for a restraining order, seeking to protect all DCFS personnel at the DCFS Metro North office from father. The request cited father's many threats to DCFS, as well as the juvenile court's January 24, 2012, observation that "father's behavior was 'extremely [volatile], impulsive and obsessive, engaged in stalking behaviors towards mother and female DCFS personnel," and the juvenile court's issuance of a stay-away order for father.

At the August 2, 2012, hearing, the juvenile court issued a temporary restraining order (TRO).

Also at that hearing, mother informed the juvenile court that father was "preventing [her] from enrolling the child in preschool." Father explained that he was not opposed to enrolling Sebastian in school, only that he wished to "propose[] other schools."

Father's counsel then acknowledged that there were problems with the visits, but he attributed those problems to father not feeling welcome at the DCFS office. Counsel suggested that the visits take place in a therapeutic setting. Sebastian's counsel asked to limit father's educational rights. She was not opposed to visitation taking place in a therapeutic setting, with the condition that if father acted inappropriately, the therapist would be able to terminate the visit and stop future visits. Mother's counsel wanted to know who would protect mother and Sebastian at the therapist's office. The juvenile court responded: "That concerns the court, as well. Just a simple transaction of trying to even accommodate what you're requesting creates a lot of concern. I mean, father is just out of control." Later, the juvenile court commented that they had "already talked about these things. This isn't something new. We've got him restrained from one social worker. He's expressed his discontent about all the social workers, pretty much. Unless somebody is totally in agreement with him, and I guess nobody's been able to agree with him to his satisfaction. [¶] I hate doing this, but I have to be concerned about the welfare of the child and mother. We do have a restraining order. And, apparently, he still is contacting her personally, which he has no right to do, according to the report. [¶] I know he hasn't started the case plan. It's just an—we're almost five months into the case plan and I don't think he's done anything. He's not drug testing. He's not enrolled. He hasn't been evaluated, and so far it's a big zero. The only thing he's doing is not doing well, it's creating a problem by his visitation." In particular, the juvenile court pointed out, and was concerned by, father's statement that he was "'going to go on a rampage.'"

The juvenile court granted mother the authority to choose Sebastian's preschool and keep the school's address confidential from father.

As for visitation, the juvenile court temporarily suspended father's visits, "until we get some progress from him. . . . And I . . . can see that he really isn't sincere in trying to

27

resolve these issues, . . . father wants to be in control of everything and anybody who tells him what to do is his enemy, as described in the reports." The minute order provides that the juvenile court "finds it detrimental to minor if visitation is to continue; father to cooperate with the case plan."

*August 27, 2012, Status Review Report*

The social worker reported that Sebastian was well cared for by mother, happy in the home, and not stressed. No emergency referrals were received during the prior period.

Mother reported that Sebastian had been sleeping well and was not anxious since visits with father were suspended. He had also stopped biting his nails.

Mother was afraid that father would try to see Sebastian at school. He had recently begun school. The first week, Sebastian cried, scared that mother would not pick him up at the end of the day. But, he calmed down after the teacher reassured him that mother would be there. At the school's open house, Sebastian fell while playing, but was not worried as he had been before, when he was visiting father.

Mother's therapist had two conjoint sessions with mother and Sebastian. The therapist observed that Sebastian had considerable insecurity. She noted that mother and Sebastian had "'a lot of work to address.'" Sebastian did not want to discuss father; when he did, he referred to father as "'"ghosts."'"

Sebastian continued in individual therapy. The social worker spoke with Youngblood about reinterviewing Sebastian about visits with father. She stated that she could not conduct such an interview or report as the counseling agency did not do such interviews. Also because of her relationship with the child, she was not qualified to do that kind of interview.

The report recounted previously reported incidents involving father's adamant refusal to participate in court-ordered services and the Evidence Code section 730 evaluation, his positive drug test, the monitored visits on July 19 and 20, 2012, his interactions with Sebastian, and the juvenile court's issuance of a TRO protecting two social workers in January 2012.

An administrative letter was sent to father on August 15, 2012, reflecting DCFS's concerns about father's threats against DCFS staff and the many complaints he made to DCFS managers.

DCFS recommended that the juvenile court terminate father's reunification services and terminate jurisdiction over the matter with an exit order granting mother sole legal and physical custody of Sebastian and monitored visits for father.

*August 27, 2012, Hearing*

On August 27, 2012, the TRO protecting DCFS staff was modified to reflect more specifically Sartorio and Pender. The orders describe father's misconduct. Along with father's threatening behavior during monitored visits, Pender recounted an incident when father parked behind her in the courthouse parking lot, slowly walked around while looking towards her car, got into his car, revved his engine, then pulled into the parking spot next to hers. He spent several minutes by his car, looking at himself in the car's windows. Pender did not exit her vehicle for another five to 10 minutes after. She stated that his actions made her feel "intimidated and threatened." Sartorio referred to the various incidents when father made threatening or menacing comments, as described above.

The juvenile court further ordered that Sebastian be reinterviewed about his visits with father. It denied father's request for visits to take place in a therapeutic setting, citing father's lack of cooperation and the lack of security in a therapist's office.

*September 28, 2012, Last Minute Information*

The juvenile court was advised that a new social worker, Chanttel Briseno (Briseno) was handling the case while Sartorio was on medical leave. She and the supervising social worker visited mother and Sebastian at their new home. She told them that father had left her a voicemail message on September 5, 2012, stating: "'Thanks to you, Sebastian is the only grandson that my father didn't see before he passed away.'" Mother reported that Sebastian still did not know that his grandfather had passed away; mother was worried as to how Sebastian might find out if father were to disclose this information. She feared that father would not inform the child in an age-appropriate

29

manner and might blame mother for the child not having the opportunity to see the grandfather one final time.

The supervising social worker interviewed Sebastian about his visits with father. He said that he wanted to visit father. Father had upset him sometimes during the visits, but he felt safe with father and felt "'good'" about him.

Mother indicated that Sebastian had been doing well and sleeping better; he seemed to be less stressed and more calm than when he was visiting father. In the past, Sebastian would demonstrate anxious behaviors, such as biting his nails, picking his nose until it bled, and biting on objects, such as remote controls. When he returned from visits with father, Sebastian would talk about wanting to play with "'ghosts,'" was continually angry, and often had nightmares during which he would cry and say that he was scared. Since the visits were suspended, Sebastian had not asked about father; he had brought him up only twice. Mother had brought Sebastian to two of her own therapy sessions. Her therapist observed that Sebastian had significant anxiety and that Sebastian's therapist needed to work on it with him.

During the visit, Youngblood went to the home and shared her observation that Sebastian seemed less anxious during the past weeks. He no longer had dark circles under his eyes, which seemed consistent with mother's statement that he was sleeping better. Sebastian had more energy and smiled more often.

Youngblood would not provide documentation, however, on whether visits should resume with father, stating that it was beyond the scope of her practice. She was willing to provide information about how Sebastian's behavior had improved since visits were suspended.

DCFS continued to recommend that father's visits be suspended as Sebastian's emotional well-being seemed to be stabilizing. If the juvenile court were to order monitored visits, DCFS requested that they take place at a police station with a professional monitor provided by father. However, DCFS reminded the juvenile court that in the past, father had harassed mother even with the police present. Father still had not participated in services.

30

Attached to the report was a June 5, 2012, letter from Dr. Michael P. Ward, informing the juvenile court that he could not conduct the Evidence Code section 730 evaluation of father because father had refused. Father said to Dr. Ward: "'I chose not to do any of the things they wanted—like parenting and your evaluation. In my opinion, this whole case is a crock.'"

Also attached to the report was an August 21, 2012, letter from Youngblood regarding her observations of Sebastian.

*Evidence Code Section 730 Evaluation of Father*

On August 30, 2012, Dr. Ward finally conducted the evaluation of father. He denied being on pain medication, but he had taken it in the past. He denied any psychiatric or substance abuse history, violence, bad temper, or getting into physical fights. He described himself as a "'positive person and outgoing.'" Father denied that there was a criminal restraining order against him; he identified a "'Keep the Peace Order.'" Father claimed that the social workers were "'covering up for each other.'" Although father admitted that he did not like the DCFS social workers, he said that he did not demonstrate an attitude with them.

Dr. Ward concluded that father did not present as psychiatrically impaired, but "this in no way precludes the possibility that he may have some serious, underlying emotional and/or personality problems." It was difficult to see in one meeting, even for a trained mental health professional, especially if the person is defensive to a degree. Dr. Ward opined that while father "may well be a rather angry, hostile and aggressive person at times, he is also quite able to control himself when he wants to. In other words, if he ever has been 'out of control,' it is most likely not the result of some psychiatric disorder, but because he has some sort of a significant attitude and/or chip on his shoulder, and simply chooses to act that way."

Referring to the juvenile court's sustained petition, Dr. Ward believed that father would need intensive long-term psychotherapy with an experienced professional, as well as an anger management program.

Having not seen Sebastian, Dr. Ward deferred making any recommendation as to visitation and directed the juvenile court to the child's therapist. Generally speaking, Dr. Ward usually did not support extended periods without contact as he believed that made it progressively difficult to reestablish contact. He thought the better way was to have some contact and make adjustments. But, Dr. Ward qualified this statement as follows: "[F]ather would have to behave more appropriately than he reportedly has sometimes done in the past during these visits." If father were able to improve his behavior and make progress in treatment as Dr. Ward discussed, then there would be a reason to move forward with more contact. Dr. Ward recommended that father look "harder and longer" at himself, rather than search for what was wrong with DCFS.

*October 25, 2012, Contested Hearing*

On October 25, 2012, the juvenile court heard the contested section 364 hearing on DCFS's recommendation to terminate jurisdiction with a family law order; the contested hearing on DCFS's section 388 petition; and the hearing on a permanent restraining order protecting the social workers.

<u>Father's Testimony</u>

Father denied much of the reported inappropriate behaviors, such as asking Sebastian about where mother's boyfriend sleeps, whether Sebastian visited a social worker's house over the weekend, using profanity in the child's presence, telling the child he would refuse to see him again if the child left the visit early because of a stomach ache, or that the child should have fallen from a chair so father could get a lot of money from the county. He denied telling Sebastian that only neglected children get sick or that "'they'" were working with mother to prevent Sebastian from going home to father. He denied telling Sebastian that mother was a table dancer. He also denied that Sebastian ever told him that he did not like it when father asked him about mother.

Father stated that he had noticed several scratches and bruises on Sebastian, but he denied that the child told him his toddler niece had scratched him during play. He would let DCFS know about them, and the social workers would interview Sebastian. Father

32

said that DCFS would then "blow . . . off" his requests to investigate. Father denied that he ever told Sebastian to shoot the Nerf gun in the niece's face.

Father also denied the various reported threats to the social workers, including following Pender in a parking lot and saying that he did not care whether he died or went to jail, but that there would "'be victims.'" He acknowledged that he said that he "despise[d]" DCFS. He claimed that mother was "personal friends" with the people who worked at DCFS.

When asked whether he was given direction by any of the social workers as to what should not be discussed during visits, father simply answered that he went by the juvenile court's instruction not to discuss the case with the child.

Father estimated that out of 210 to 211 visits, he parked or was driven in the direction of where mother's car was located. He testified that he was unaware of a specific arrangement for him and mother to arrive on different sides of the building or that he was supposed to arrive and leave from a certain part of the building. He admitted to saying "'Bye Linda'" to mother at the end of the last visit.

Father saw mother several times when he arrived for the visits. He claimed that DCFS was aware of this, but did not advise him what he should do. When father came for the visits, Sebastian would see him and run towards him.

Sebastian went to some of the visits sick and father would ask him if he went to the doctor. Father asked DCFS for paperwork, but said that he was ignored and had not been provided with anything.

Father testified that one or two visits terminated early, explaining that it was because "they're trying to change something on me, they come up with some excuse to terminate." The monitor did not provide father with a reason as to why the last visit was terminated.

Father claimed that he was accused of stealing one of the social worker's cell phones, and he immediately called the supervisor demanding that she be taken off of his case. He added: "I don't need her cell phone, I can afford to buy three of her cell phones." He described the social worker as being hostile to him. Father said that she

33

would not let Sebastian go to the restroom with him, and the child had refused to go with the social worker.

Father stated that the only court-ordered programs that he had complied with were the Evidence Code section 730 evaluation and some of the drug testing. When asked if he had attended individual counseling to address case issues, father replied: "Lady, I'm under 100 percent control all the time, so I didn't comply with that."

Father said that he recorded his visits with Sebastian, by turning on his cell phone or having a third party record the visits.

Finally, father testified that there was no restraining order protecting mother.

<u>Sartorio's Testimony</u>

As of about a month ago, Sartorio was no longer the assigned social worker to this case. He monitored many visits.

Father had threatened and harassed him, citing to the previously reported behaviors. Sebastian was present during those incidents. Sartorio was afraid of father, who had threatened him. He remained on the case, although he had asked to be removed.

Sartorio heard father question Sebastian about mother on multiple occasions, including questions about mother's boyfriend. Father was "difficult" to redirect. Sartorio told father that his questioning of Sebastian was inappropriate, but he did not behave this way every time. The social worker told father not to discuss the case during his visit, that the time was for him to spend with Sebastian.

Sartorio had never terminated a visit early. It was something that he would discuss first with someone else, such as his supervisor.

Sartorio encouraged father to participate in services, but father refused.

In Sartorio's opinion, mother had a valid fear in regards to father calling the Child Protection Hotline and the police, and mother's resulting caution that Sebastian would get scratched or bruised during play and her leniency with the child. Sartorio asked Sebastian about his scratches or marks. Sebastian was not always responsive to him, but it was different qualitatively than the child's response to father.

Sartorio recalled that mother had obtained a restraining order, but he could not remember the details of it—only that one existed and she had shown it to him. What Sartorio knew was that father was not to be near mother, yet he saw father get close to her. Regardless, he acknowledged that he did not know the details of the restraining order when he wrote that father had violated it. He could not recall the circumstances that led him to write that father had threatened mother.

Sartorio's conclusion that visits would be detrimental to Sebastian was based upon Youngblood's description of Sebastian's anxiety around father.

Court Ruling

The juvenile court reissued the TRO protecting Sartorio and Pender.

Father asked for monitored telephone contact with Sebastian; the juvenile court denied his request.

The matter was continued to November 6, 2012.

Pender's Testimony

Pender served as a monitor for several visits, but she was not the case-carrying social worker. She felt threatened, annoyed, or harassed by father, and described the incidents previously reported, specifically the incident in the parking lot.

On multiple occasions, she had to redirect father, who was acting inappropriately towards the child. He often questioned Sebastian about mother as well as about his sleeping and eating. She would try to get father to focus on enjoying the visit. Father's questioning was very stressful for Sebastian as it seemed there was no satisfactory answer. The tone of the questioning was sometimes akin to an interrogation. It was difficult to redirect father, although occasionally he listened. When Pender would try to redirect father, he sometimes would insist that it was his right to know what was happening with his child; he seemed determined to continue questioning his son.

Over the course of the visits that she monitored, Pender observed Sebastian becoming increasingly stressed in response to father's questions. Initially, the child appeared annoyed but would try to answer. Later, Sebastian "would just shut down and refuse to answer the questions. And then further down the line, after a certain point, then

35

the child became more anxious," and he would say that his stomach hurt or that he wanted to leave. Father would question Sebastian, wanting to know who told him to say that his stomach hurt and whether it was a social worker. He sometimes appeared to be "oblivious" to what was happening with his child.

Pender believed that father's use of real gun and ammunition terminology when playing Nerf games with his four-year-old son was inappropriate. She felt that father was also trying to communicate to the social worker that he knew how to use a gun. She did not tell father to stop using that terminology, explaining that she would confront him only in those instances when Sebastian was "clearly stressing out."

She explained the circumstances that would compel her to terminate a visit: When a child became distressed to the point that continuing the visit would be a detriment; if the child were physically sick; or if a parent became increasingly loud and resisted redirection. She was asked the following hypothetical question: If you had been the case-carrying social worker on the case, would you have terminated the visits early? She answered that she likely would have.

Tyrone's Testimony

Tyrone monitored father's visits. Initially, mother would arrive with Sebastian and meet Tyrone inside the parking structure. But later they moved to meeting at the curb in front of the building. This became problematic because father would approach mother's car and call to her; so, the meeting place with the monitor changed to the back of the building. Father would be inches from mother's car because he would be standing with Tyrone to get Sebastian. Other times, father would arrive before Tyrone, and mother reported to Tyrone that father would approach her vehicle before Tyrone arrived.

Tyrone was aware of a restraining order prohibiting father from being near mother. She tried to inform father of this many times, to no avail. She had not seen the restraining order, but explained that she did not need to know the details of it because this was not her case; she was simply the monitor. All she needed to know was that father was not supposed to be at a particular location.

36

She had difficulty redirecting father during visitation. On a scale from one to ten, father was a "10" in terms of being difficult to monitor.

Father questioned Sebastian on practically every visit, asking him what he ate, where he went, who he was with, what mother did, whether she took him to work, whether he played at someone's house, and whether they had "rats in the house." Father's queries seemed centered on mother. He also asked about mother's boyfriend and where he slept. Sebastian did not seem excited to answer father's questions. Rather, the questions made Sebastian "stressed, agitated, again [making] excuses about his stomach hurting or [saying that] he wanted to leave or he would just totally ignore him."

Tyrone explained that father's questioning was different than how parents normally asked of their children during visits. She would attempt to redirect father on every visit, reminding him that the purpose of the visit was to enjoy Sebastian and bond. Father would continue questioning the child, unfazed by what she said. In fact, her attempts sometimes led to their arguing.

Father frequently told the child that the social workers were stupid.

Father also had become volatile during visits, which often took place in the lobby, in Sebastian's presence. She recounted the last visit she monitored, with father telling the child to get his bag; father became disturbed, began calling someone on the telephone, and was pacing; Sebastian was upset and anxious thinking that father was going to call the police.

From about June until the visits stopped, it became increasingly difficult for Tyrone to coax the child from the car to visit father. On those occasions, Sebastian would say that he did not want to go, explaining that he did not want to see father. She believed that father's incessant questioning was why Sebastian did not want to visit father.

She estimated that Sebastian unequivocally enjoyed only two of his more than 25 visits with father.

37

Closing Argument and Juvenile Court Order

After Tyrone's testimony, while counsel and the court were discussing possible additional witnesses, father blurted out, "I want to see my son, just quit the bullsh*t."

After hearing extensive oral argument, the juvenile court found that DCFS had "clearly met its burden." Regarding Dr. Ward's evaluation, the juvenile court noted that while no psychosis was detected, "that doesn't mean one isn't there . . . . I think we may have to consider the possibility that [father] knows exactly what he's doing and he knows how to intimidate people and used the very tactics that he's aware of and that's how he functions. And the problem is, there's a child involved." The juvenile court asked how the visitation could be reinstated when father was "adamant about not cooperating with the case plan." The court believed that it had been beneficial to Sebastian to not experience the stress father had imposed and the circumstances that he put the child in, resulting in Sebastian's anxiety. It believed that visitation with father was detrimental to the child, stating: "I still see a detriment to the child and I'm not prepared to start the visitation until father has begun to comply with the case plan, and in particular anger management counseling and intensive individual counseling. If he's not willing to do that, we're wasting our time." Father replied, "We are wasting our time."

Thus, it granted the section 388 petition to continue the suspension of father's visitation.

The juvenile court also granted a permanent restraining order protecting the social workers; that order was set to expire in December 2015. The juvenile court declined to terminate jurisdiction.

*TRO for Mother; Father's Appeal*

On December 11, 2012, mother filed a request for a restraining order, protecting her and Sebastian from father. In support, mother described father's conduct as sustained by the juvenile court in the section 300 petition. The juvenile court issued a TRO, to be in effect until January 8, 2013.

Father timely filed a notice of appeal on December 13, 2012.

*December 11, 2012, Last Minute Information*

DCFS reported that Sebastian was being transitioned to a new therapist, Jennifer McNamara (McNamara) because Youngblood was leaving the agency. Youngblood reported that Sebastian was doing well, making substantial progress, and had diminished anxiety.

Mother reported that father had texted her twice about Sebastian's birthday. She also received calls twice a week from a blocked number; she did not answer those calls.

On November 30, 2012, Briseno asked father whether he needed any referrals. Father replied that "it was 'a little too late for that.'" He asked about Sebastian. He also asserted that Sebastian was not supposed to be enrolled in school according to a family law court order. When asked about his participation in services, father only said that everything would be addressed in court. He then requested his complete case file; Briseno said that she would forward the documents that he was able to have.

That night, father left a voicemail message for Briseno, stating that he was returning the call: "'First of all, don't call my number again. If I called the mother, if I texted the mother and requested information about my son, I think we should leave it like that. There is open communication. There is no restraining order and your office is well aware of that. So please do not get involved in this thing. I'm tired of you people. Don't call me no more. You send me my paperwork I requested, and we will go from there. This should be recording.'"

DCFS reiterated its prior recommendation that father's visits with Sebastian be suspended. Alternatively, DCFS recommended that the visits be held at a local police station with father providing his own private, professional monitor.

Attached to the report was a November 21, 2012, letter cosigned by Youngblood and another therapist, identifying Sebastian's treatment goals as decreasing the child's anxiety. According to the therapists, Sebastian had made "significant progress" and there had been reported decreases in his nightmares, crying, and bedwetting.

39

*Permanent Restraining Order*

The TRO was extended to February 1, 2013, when the juvenile court conducted a hearing on the request for a permanent restraining order. Mother testified that she was seeking a restraining order against father. In support, she cited to father's assault and attempts to assault her, her boyfriend, and her 70-year-old aunt in 2008, 2010, and 2011, and his continued harassment of her since then. When mother parked for visits, father would be there waiting for her. She was frightened of him. She recalled father coming up to her at a DCFS meeting and laughing in her face. Father also had threatened to kill her and he was arrested. In fact, he had threatened "everybody who is near [her]." Father had called mother an "ignorant bitch" and was disrespectful of her in front of Sebastian. He told her as well as the previous DCFS investigator that he had called mother a "bitch." Sebastian also relayed that father was directing the child to stab her boyfriend with a fork while he slept and to lie that the boyfriend had hit Sebastian.

Mother testified that she had continually tried to get protection "but no one ever listened to [her]." She cried during her testimony. When mother had attempted to get a restraining order after father tried to harm her in an April incident, mother went to court, along with witnesses, but they were not allowed to speak. Mother had testified, but the other witnesses needed interpreters and the trial court indicated that no translators were available. Mother said that she told the truth in court. Mother's boyfriend tried to testify in family court but again no translator was available. The trial court did not grant her a restraining order then.

Mother confirmed that she had told Sartorio that she had a restraining order against father and that she kept it in her car. She did not have it in court because her car "got ruined." Mother had asked Sartorio whether she should bring the restraining order to the December 2012 hearing, but he told her a copy was in court already.

Father testified next. He said that mother previously had attempted to obtain a restraining order against him. He theorized that mother was trying to get a restraining order because she had a friend who did the same thing. He believed that mother was going to claim political amnesty based on father's alleged abuse.

40

There was a criminal charge and proceedings pending against father stemming from his striking mother's boyfriend with a cane. He had not been criminally charged for biting mother's shoulder, an incident he denied.

In response to whether father had ever been served with a restraining order in 2011, he indicated that there was a "keep the peace order."

Following closing argument, the juvenile court granted mother's request for a permanent restraining order, describing the evidence as "overwhelming." The evidence was more than sufficient to demonstrate that father "stalked" and "intimidated" mother. In addition, the juvenile court referred to the sustained domestic violence counts as well as a pending criminal case.

The juvenile court granted the restraining order to be in effect for five years, until February 1, 2018.

*Consolidated Appeals*

Father timely filed a notice of appeal from the restraining order hearings.

The two appeals were consolidated.

## DISCUSSION

I. *The juvenile court did not abuse its discretion when it granted the section 388 petition suspending father's visits*

A. Applicable law

Section 388 provides, in relevant part: "Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstances or new evidence, petition the court . . . for a hearing to change, modify, or set aside any order of court previously made." (See also Cal. Rules of Court, rule 5.570.)

"'Whether a previously made order should be modified rests within the dependency court's discretion, and its determination will not be disturbed on appeal unless an abuse of discretion is clearly established.'" (*In re Amber M.* (2002) 103 Cal.App.4th 681, 685; see also *In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) "'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of

41

reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.)

B. Analysis

Ample evidence supports the juvenile court's decision to suspend father's visitation with Sebastian until he complied with the court-ordered case plan and was no longer an emotional risk to the child. At the forefront was father's incessant and pressured questioning of the then-four-year-old child, much of which focused on issues well beyond the appropriate subjects for a small child to consider—namely mother, mother's boyfriend, mother's care of Sebastian, and father's complaints about DCFS and the social workers. There was no way for Sebastian to respond to father's interrogation; in fact, all father's behavior elicited was stress and distress from Sebastian.

Father's conduct during drop-offs and pick-ups also proved detrimental. Whether there was a "keep the peace" order or a stay away order or a restraining order, father was doing anything but complying. His mere presence and greetings were threatening to mother and the social workers. And, Sebastian's anxiety seeped into the visits when father ranted, yelled, became profane, and threatened the social workers—Sebastian became so afraid that father would call the police and have him removed from mother.

Sebastian's anxiety was significant. His sleep was disturbed. And, he frequently had nightmares after visits with father.

After his visits with father were suspended, Sebastian demonstrated diminished anxiety. He smiled and slept better. His separation anxiety with mother greatly improved. Other anxious behaviors, such as nail biting and picking his nose until it bled, also improved.

Through all of this, father refused to comply with any of the court-ordered programs, with the exception of two drug tests and the eventual participation in the Evidence Code section 730 evaluation. Although Dr. Ward believed that father needed long-term intensive psychotherapy and anger management, father made it clear that he

42

would not comply with any services that would address the emotional harm he was causing his son.

Sadly, Sebastian did enjoy spending time with father when father was appropriate and focused on being with him, rather than looking for evidence of mother's shortcomings or bureaucratic conspiracies. But, the level of anxiety and stress that father caused Sebastian made him, at times, not want to visit his father. Father's pattern of, and increasing, volatility, as well as his inability to be redirected even when Sebastian was clearly filled with anxiety left the juvenile court with no option but to grant DCFS's section 388 petition and suspend father's visits.

In urging us to reverse, father relies upon section 362.1. As pointed out by DCFS, the juvenile court made its findings under section 388; thus, section 362.1 does not apply.

It follows that father's reliance upon *In re C.C.* (2009) 172 Cal.App.4th 1481 is misplaced. After all, in that case, the Court of Appeal considered a visitation order made at the time of the dispositional hearing, pursuant to section 362.1. (*Id.* at p. 1483.) Here, father was granted visitation early in the proceedings, but, as a result of his volatile behavior, DCFS sought to suspend his visits (pursuant to § 388) until he complied with the case plan.

Even if the analysis of *In re C.C.* were to apply to this case, we would still affirm the juvenile court's order. Unquestionably, visitation is important during the reunification period. (*In re C.C.*, *supra*, 172 Cal.App.4th at pp. 1490–1492.) After all, without visitation, "it is virtually impossible for a parent to achieve reunification." (*Id.* at p. 1491.) But, visitation is not what stands in father's way to reunification. Rather, his adamant refusal to participate in any court-ordered services, his total disregard of the aid DCFS and its social workers were trying to provide, and his explosive behavior have made visitation with Sebastian detrimental to the child—suspension of visitation, at this point, is the only way to ameliorate Sebastian's stress and anxiety. (See *In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1008.)

II. *Restraining order*

Father contends that the juvenile court erred in issuing the restraining order that included Sebastian and expired in five years.

A. Duration of restraining order

Section 213.5, subdivision (d)(1), provides, in relevant part: "Any restraining order granted pursuant to this subdivision shall remain in effect, in the discretion of the court, no more than three years, unless otherwise terminated by the court, extended by mutual consent of all parties to the restraining order, or extended by further order of the court on the motion of any party to the restraining order."

Here, the juvenile court issued a restraining order that is set to expire in five years. Because the statute limits a permanent restraining order to three years (absent mutual consent or an order following a motion, neither of which are present here), such an order is beyond the juvenile court's jurisdiction. (*People v. Tindall* (2000) 24 Cal.4th 767, 776.) The matter will be remanded to the juvenile court so that the order can be modified to expire three years from the date of issuance (Feb. 1, 2016).

B. Forfeiture

Father has forfeited his argument that Sebastian should not be protected by the restraining order. Forfeiture is the "loss of a right based on failure to timely assert it. . . . [A] person who fails to preserve a claim forfeits that claim." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. 2., superseded by statute on other grounds as stated in *In re S.J.* (2008) 167 Cal.App.4th 953, 962.) "As a general rule, a party is precluded from urging on appeal any point not raised in the trial court. [Citation.] Any other rule would ""'permit a party to play fast and loose with the administration of justice by deliberately standing by without making an objection of which he is aware and thereby permitting the proceedings to go to a conclusion which he may acquiesce in, if favorable and which he may avoid if not.'" [Citations.]' [Citation.]" (*In re Riva M.* (1991) 235 Cal.App.3d 403, 411–412.)

Because father failed to timely raise the issue he raises now, for the first time on appeal, regarding the inclusion of Sebastian, we will not consider it. We decline father's

invitation in his reply brief to consider this belatedly raised issue. Our analysis could stop here.

For the sake of completeness, we continue to the merits of father's contention on appeal.

C. Applicable law

Section 213.5, subdivision (a), permits a juvenile court to issue a restraining order against a parent before the termination of dependency jurisdiction. If the juvenile court issues a restraining order after notice and a hearing, it may rely on the entire juvenile court file; an affidavit is not necessarily required. (§ 213.5, subd. (d).)

Some courts have applied the substantial evidence standard of review to the trial court's factual findings in support of the order. (*Sabbah v. Sabbah* (2007) 151 Cal.App.4th 818, 822.) Challenges to the sufficiency of the evidence are viewed in a light most favorable to the respondent, and we indulge all legitimate and reasonable inferences to uphold the juvenile court's determination. (*In re Cassandra B.* (2004) 125 Cal.App.4th 199, 210.) "If there is substantial evidence supporting the order, the court's issuance of the restraining order may not be disturbed." (*Id.* at pp. 210–211.) Other courts have reviewed the juvenile court's decision to issue a permanent restraining order for abuse of discretion. (*In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1512.) A court abuses its discretion when its decision exceeds the bounds of reason. When multiple inferences reasonably can be deduced from the evidence, the reviewing court may not substitute its decision for that made by the trial court. (*In re Stephanie M., supra,* 7 Cal.4th at pp. 318–319.)

The practical differences between these two standards are not significant (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351), and under either standard of review, we affirm the juvenile court's order issuing a restraining order.

D. Restraining order was proper

Father argues that Sebastian has not been harmed or at risk of harm by him, and that the juvenile court order for father "to participate in an extensive case plan [is] sufficient to protect the minor." The irony is that father points to the court-ordered case

plan—a plan that he has steadfastly refused to participate in—as protection for Sebastian. There is no protection in a case plan in and of itself. Father's participation is required for the case plan to have any effect. Where father refuses to see even a need for such services, then the case plan is powerless to address or alleviate any risk of harm.

Regardless, it has been recognized that a child need not have already suffered harm or threat by the restrained person or that a reasonable concern of future abuse is required before warranting the protection of a restraining order. (*In re B.S.* (2009) 172 Cal.App.4th 183, 193.) Instead, a restraining order may be granted "if 'failure to make [the order] may jeopardize the safety of the petitioner . . . .' [Citations.]" (*In re B.S.*, *supra*, at p. 194.)

Here, father's continual stalking, annoying, and threatening of mother also involved Sebastian. His numerous calls to the Child Protection Hotline alleging mother's neglect and/or abuse necessitated investigations that made Sebastian, as well as mother, paranoid and anxious. His stalking of mother at the start and end of visits (in violation of the criminal restraining order or, in the alternative, keep the peace order) scared Sebastian too. (*In re Cassandra B., supra,* 125 Cal.App.4th at p. 209 [The juvenile court must consider prior restraining orders issued against the person and any violations of the prior restraining order].) He worried that father would call the police to have him taken from mother.

Father's oppressive questioning, taking of photographs of any slight mark or scratch, videotaping of Sebastian and mother, volatile behavior with absolute disregard for Sebastian, who was present, threats of violence towards DCFS in the child's presence all weigh heavily in support of the juvenile court's decision to include Sebastian in the restraining order.

# DISPOSITION

Paragraph 6.a. of the juvenile court's permanent restraining order is modified to strike the expiration date of February 1, 2018.  As modified, paragraph 6.a. of the restraining order shall provide that it expires February 1, 2016 (three years from the date of issuance).  As modified, the permanent restraining order is affirmed.  The matter is remanded with directions to the juvenile court to correct the permanent restraining order to conform to this modification.  In all other respects, the juvenile court's orders are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
                ASHMANN-GERST


We concur:


_____, P. J.
        BOREN


_____, J.
        CHAVEZ

47